UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
RA GLOBAL SERVICES, INC. f/k/a
REALAMERICA CO. and GEORGE E. BURCH III,

                    Plaintiffs,

        - against -

AVICENNA OVERSEAS CORP., HÜSEYIN GÜN,
TODD PETERSON, and NIXON PEABODY LLP,

                    Defendants.
----------------------------------------X

**MEMORANDUM AND ORDER**

10 CV 2701 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

    Plaintiffs RA Global Services, Inc. f/k/a RealAmerica Co. ("RA Global") and George E. Burch III ("Burch" and together with RA Global, "plaintiffs") bring this diversity action against defendants Avicenna Overseas Corp., Hüseyin Gün, Todd Peterson, and Nixon Peabody LLP ("Nixon"), seeking damages and a declaratory judgment.  Presently before the Court is Nixon's motion to dismiss on the grounds that plaintiffs' four claims against Nixon are each barred by the applicable statute of limitations.  In opposition, plaintiffs contend that this action was timely commenced.

    For the reasons stated herein, we grant Nixon's motion to dismiss.

## BACKGROUND

**I.   Factual Background**

**A.   Parties**

Plaintiff RA Global is a publicly-traded corporation that is incorporated in Delaware and has its principal place of business in Texas.[1]   (FAC ¶ 2.)   The company provides global oilfield services and has operations in the United States, Canada, Africa, the Middle East, Central Asia, and Russia.   (FAC ¶ 16.)   In 2005, RA Global was in need of capital to fund its business operations and expansion plans.   (FAC ¶ 16.)   Plaintiff Burch, a Texas resident, is an executive officer of RA Global and Chairman of its Board of Directors.   (FAC ¶ 3.)

Defendant Avicenna Overseas Corp. ("Avicenna") is an entity organized under the laws of the British Virgin Islands.   (FAC ¶ 4.)   As described in further detail below, Avicenna provided secured loans to RA Global in 2005 and 2006.   (FAC ¶ 25.) Defendant Hüseyin Gün ("Gün"), a citizen of the United Kingdom, is a principal of Avicenna.   (FAC ¶ 5.)

Defendant Todd Peterson is a citizen of New York and, during some of the relevant time period, was a partner at Nixon,

---

[1] The facts noted herein are derived from the first amended complaint ("FAC"), together with documents attached to the complaint, documents incorporated into the complaint by reference, and documents of which we take judicial notice.   See Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425-36 (2d Cir. 2008); Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).   For purposes of reviewing this motion to dismiss, all nonconclusory allegations are accepted as true.   See S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 104 (2d Cir. 2009).

a New York-based law firm.  (FAC ¶¶ 6-7.)  Peterson left Nixon in or about August 2007 and joined the law firm of Edwards Angell Palmer and Dodge LLP.  (FAC ¶ 33.)  Peterson and Nixon acted as outside counsel to defendant Avicenna.  (FAC ¶ 23.)

### B.   Transactions

In 2005, RA Global determined that it needed an infusion of capital and turned to a company called CapitalinQ Limited ("CapitalinQ") for financial advice.  (FAC ¶¶ 11, 17.)  In response, CapitalinQ introduced RA Global to potential investors and lenders, including Avicenna and an entity called GEM Management Limited ("GEM").  (FAC ¶¶ 13, 17-22.)  According to plaintiffs, CapitalinQ had undisclosed connections to both Avicenna and GEM.  (FAC ¶¶ 19-22.)

Plaintiffs were also introduced to Peterson, who was then acting as outside counsel to Avicenna.  (FAC ¶ 23.)  Following the introduction, Peterson informed plaintiffs that he and Nixon would act as counsel to plaintiffs.  (FAC ¶ 23.)  Plaintiffs further allege that Peterson and Nixon in fact represented plaintiffs from July 2005 through October 2006 in connection with a series of transactions.  (FAC ¶¶ 23, 44-45.)  These transactions are described in further detail below.

### 1.   Loans to RA Global

On July 26, 2005, RA Global and Avicenna entered into a loan agreement ("First Loan Agreement"), pursuant to which

Avicenna agreed to lend $600,000 to RA Global. RA Global executed a promissory note and Burch executed a personal guaranty to secure the loan. (FAC ¶ 25.) According to the complaint, Peterson and Nixon represented both the lender, Avicenna, and the borrower, RA Global, in connection with the First Loan Agreement.[2] (FAC ¶¶ 23, 44-45.)

On June 28, 2006, RA Global and Avicenna entered into another loan agreement ("Second Loan Agreement"), pursuant to which Avicenna agreed to lend an additional $150,000 to RA Global. Again, RA Global executed a promissory note and Burch executed a personal guaranty to secure the loan. (FAC ¶ 25.) According to the complaint, Peterson and Nixon represented both lender and borrower in connection with the Second Loan Agreement.[3] (FAC ¶¶ 23, 44-45.)

On August 25, 2006, RA Global entered into a Memorandum of Understanding ("MOU") with several of its creditors, including Avicenna, GEM, and CapitalinQ. (FAC ¶¶ 25, 30.) The MOU

---

[2] The First Loan Agreement lists Nixon and Peterson as counsel for Avicenna but not for RA Global. (Declaration of Frederick B. Warder III in Support of Nixon Peabody LLP's Motion to Dismiss the First Amended Complaint ("Warder Decl.") at Ex. B (First Loan Agreement) § 6.7.) No law firm or lawyer is listed as counsel for RA Global. The First Loan Agreement also specifies that RA Global agreed to "pay all costs and expenses that [are] incurred by both [RA Global] and the Lenders with respect to the negotiation, execution, delivery and performance of this Agreement." (Id. § 6.8.)

[3] The Second Loan Agreement also lists Nixon and Peterson as counsel for Avicenna. (Warder Decl. Ex. C (Second Loan Agreement) § 13.) No law firm or lawyer is listed as counsel for RA Global. The Second Loan Agreement also provides that "[RA Global] hereby agrees to pay [Avicenna's] costs, including reasonable attorneys fees, in relation to the preparation and execution of this Agreement. (Id. § 10.1.)

4

restructured RA Global's loans, extending the maturity date of the company's outstanding debt and requiring an additional personal guaranty from Burch. (FAC ¶ 32.) Again, plaintiffs allege that Peterson and Nixon represented both Avicenna and plaintiffs in connection with the MOU.[4] (FAC ¶¶ 23, 44-45.)

Pursuant to the MOU, RA Global had to make certain concessions to its lenders. For example, Avicenna was entitled to nominate a candidate to RA Global's Board of Directors. (FAC ¶ 33.) Avicenna's nominee was Peterson, the Nixon lawyer, who became a director as of the date of the MOU. (FAC ¶ 33; Declaration of Brian Gardner in Opposition to the Motion of Nixon Peabody LLP to Dismiss the First Amended Complaint ("Gardner Decl.") at Ex. A (MOU).) The MOU also required RA Global to hire two creditor-approved executives. (FAC ¶ 34.) As required, RA Global hired Jonathan Apps as Chief Financial Officer and Abid Hamid as Chief Executive Officer. (FAC ¶ 34.) After being hired, the new executives acted without necessary authority, withheld information from RA Global's Board of Directors, and otherwise harmed RA Global. (FAC ¶¶ 34, 40.) Additionally, the MOU required RA Global to issue 15.5 million shares of common stock for distribution to creditors. (FAC

---

[4] The MOU does not name counsel for any of the parties thereto. (Gardner Decl. Ex. A.) The only mention of either Nixon or Peterson is on Exhibit C to the MOU, which lists Peterson as a member of RA Global's Board of Directors. (Id. at 3, 8.).

¶ 35.)  This greatly increased the creditors' equity stake in RA Global and reduced the equity stake of RA Global's original founders and management team.  (FAC ¶ 35.)

## 2.  RA Global's Acquisition of IGOMS

During the time period at issue, RA Global also acquired additional assets.  Specifically, on April 25, 2006, RA Global purchased a forty-nine percent interest in Intergulf Oilfield and Marine Services, LLC ("IGOMS"), a marine vessel construction and repair company and fabrication operation.  (FAC ¶¶ 27-29.) RA Global sought at least one of the above-mentioned loans to help finance its acquisition of IGOMS.  (FAC ¶ 28.)

On October 8, 2006, plaintiffs executed an escrow deed concerning IGOMS ("Escrow Deed").  Pursuant to the Escrow Deed, RA Global transferred its shares of IGOMS stock to an escrow agent ("IGOMS Escrow Agent").  (FAC ¶ 36.)  If RA Global failed to repay its debt by July 2007, the IGOMS Escrow Agent would disburse the IGOMS shares to GEM, one of RA Global's creditors; if RA Global repaid its debt by that time, the IGOMS Escrow Agent would disburse the IGOMS shares to RA Global.  (FAC ¶ 37.)

Although Avicenna was not a party to the Escrow Deed, plaintiffs allege that Nixon represented both Avicenna and

plaintiffs in connection therewith.  (FAC ¶ 37; Warder Decl. Ex. D (Escrow Deed).[5]

### 3.   RA Global's Alleged Default

In July 2007, GEM, one of RA Global's lenders, sent RA Global a notice of default.  In that notice, GEM stated that RA Global was in default and that more than $1.9 million was immediately due and payable to GEM.  (FAC ¶ 47.)  GEM also advised the IGOMS Escrow Agent that RA Global was in default and demanded that the IGOMS shares be transferred to GEM.  (FAC ¶ 48.)  The IGOMS shares were ultimately transferred to GEM. (FAC ¶ 48.)

As described in further detail below, litigation among the parties commenced shortly thereafter.

### C.   Allegations Concerning Nixon

Plaintiffs assert four causes of action against Nixon: for fraudulent inducement, malpractice, conspiracy, and unjust enrichment.  These causes of action are based upon the central allegation that Peterson and Nixon were part of a "loan-to-own" scheme, which involved a conspiracy by CapitalinQ, GEM, Avicenna, Gün, and Peterson, among others, to take control of RA Global and to abscond with RA Global's assets.  (FAC ¶¶ 27, 54.) In particular, plaintiffs allege that the object of defendants'

---

[5]  The Escrow Deed does not mention Nixon or Peterson in any capacity, including as counsel to RA Global.

scheme was to take possession of IGOMS, RA Global's recent and valuable acquisition.  (FAC ¶ 27.)

More specifically, plaintiffs allege that Peterson and Nixon represented both Avicenna and plaintiffs in connection with the First Loan Agreement, the Second Loan Agreement, the MOU, and the Escrow Deed.  (FAC ¶¶ 23, 44.)  Plaintiffs allege that, despite this dual representation, neither Peterson nor Nixon discussed the conflict of interest with plaintiffs.  (FAC ¶¶ 23, 45.)  Similarly, plaintiffs assert that they never signed a conflict waiver, nor did Peterson or Nixon disclose to plaintiffs that they were "acting principally at the direction of the Avicenna Defendants for the primary interests of the Avicenna Defendants."  (FAC ¶¶ 23-24, 45.)  In addition to failing to disclose the conflict, plaintiffs allege that Nixon and Peterson failed to disclose the loan-to-own scheme, failed to adequately negotiate the above-mentioned agreements, and failed to properly advise RA Global concerning the substance of the agreements.  (FAC ¶¶ 45, 73-80.)

Plaintiffs further allege that Nixon's and Peterson's conduct constituted more than bad advice.  According to plaintiffs, Nixon and Peterson misrepresented and withheld material information for the purpose of inducing plaintiffs to enter into some or all of the above-mentioned transactions.  (FAC ¶¶ 69-72.)  Similarly, plaintiffs allege that "[t]he

agreements entered into with the Avicenna Defendants were obtained only by way of the improper relations of Peterson and Nixon [] with Plaintiffs and the Avicenna Defendants . . ." (FAC ¶ 24.)

Plaintiffs also allege that Nixon communicated with, advised, and invoiced plaintiffs from in or around July 2005 through October 2006. (FAC ¶¶ 23, 44.) According to plaintiffs, Nixon sent an invoice to RA Global on October 6, 2005. That invoice, for $23,170.61, listed RA Global as Nixon's client. (FAC ¶ 45.)

## II. Procedural History

### A. Other Litigation

This lawsuit was preceded by a number of other actions involving similar factual allegations. On August 23, 2007, shortly after GEM sent RA Global a notice of default, plaintiffs commenced a lawsuit in Texas state court ("Texas Action").[6] Plaintiffs named GEM, Avicenna, CapitalinQ, Gün, and others as defendants and asserted various causes of action, including for fraudulent inducement and conspiracy. (FAC ¶ 48; Warder Decl. at Ex. E (complaint).) In the Texas Action, plaintiffs alleged that GEM, Avicenna, CapitalinQ, Gün, and others were involved in a conspiracy to take control of RA Global and to misappropriate

---

[6] The Texas Action was later removed to the United States District Court for the Northern District of Texas.

its assets.  (Warder Decl. Ex. E.)  Although plaintiffs did not
name Nixon or Peterson as defendants in the Texas Action,
plaintiffs alleged that Peterson was a "captive" director on RA
Global's Board and was controlled by Gün, the principal of
Avicenna.  (Warder Decl. Ex. E ¶ 30.)

In December 2008, Avicenna commenced a lawsuit against RA
Global in New York state court, seeking repayment of its loans
("New York Action").[7]  (FAC ¶ 33.)  Thereafter, the court
dismissed the New York Action based on a forum selection clause
that designated the UK as the appropriate forum.  Following that
dismissal, Avicenna commenced an action in the United Kingdom,
again seeking repayment of its loans to RA Global ("UK Action").
Nixon was not named as a party in either the New York Action or
the UK Action.

### B.   The Instant Action

On March 26, 2010, plaintiffs commenced this action, naming
Avicenna, Gün, Peterson, and an entity called Avicenna Capital
Limited as defendants.  Plaintiffs amended their complaint on
September 21, 2010, adding Nixon as a defendant and dismissing
Avicenna Capital Limited from the action.

---

[7] Avicenna was represented in the New York Action by Edwards Angell Palmer and
Dodge LLP, Peterson's new law firm.  (FAC ¶ 33.)  In February 2009, shortly
after the New York Action was commenced, Peterson was removed from the Board
of RA Global.  (FAC ¶ 33.)

Nixon filed the instant motion to dismiss on December 8, 2010 and the Court held oral argument on August 10, 2011.

**DISCUSSION**

**I.    Applicable Law**

    **A.    Rule 12(b)(6)**

When deciding a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences in plaintiffs' favor. Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007). A complaint must include "enough facts to state a claim for relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929, 949 (2007). Where plaintiffs have not "nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." Id. This pleading standard applies in "all civil actions." Ashcroft v. Iqbal, __ U.S. __, 129 S. Ct. 1937, 1953, 173 L. Ed. 2d 868, 887 (2009).

In evaluating a motion under Rule 12(b)(6), the Court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, . . . and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." ATSI

Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir.
2007). Additionally, on a Rule 12(b)(6) motion to dismiss, a
court may consider matters of which judicial notice may be
taken. See, e.g., Staehr v. Hartford Fin. Servs. Grp., Inc.,
547 F.3d 406, 425-26 (2d Cir. 2008); Samuels v. Air Transp.
Local 504, 992 F.2d 12, 15 (2d Cir. 1993). Notably, "courts
routinely take judicial notice of documents filed in other
courts . . . to establish the fact of such litigation and
related filings." Kramer v. Time Warner Inc., 937 F.2d 767, 774
(2d Cir. 1991); see also Global Network Commc'ns, Inc. v. City
of New York, 458 F.3d 150, 157 (2d Cir. 2006).

Thus, in deciding the present motion to dismiss, we
consider the loan agreements, the MOU, the Escrow Deed, and the
court documents from the Texas Action, all of which are
incorporated by reference into the FAC. We also take judicial
notice of the Texas Action, the New York Action, and the UK
Action.

### B.   N.Y. C.P.L.R. 202

As a threshold matter, we must determine what laws apply to
the timeliness inquiry. Pursuant to section 202 of the New York
Civil Procedure Law and Rules ("C.P.L.R."):

> [a]n action based upon a cause of action
> accruing without the state cannot be
> commenced after the expiration of the time
> limited by the laws of either the state or
> the place without the state where the cause

12

> of action accrued, except that where the
> cause of action accrued in favor of a
> resident of the state the time limited by
> the laws of the state shall apply.

N.Y. C.P.L.R. 202. In other words, "a court, when presented with a cause of action accruing outside New York, should apply the limitation period of the foreign jurisdiction if it bars the claim." Ins. Co. of N. Am. v. ABB Power Generation, Inc., 91 N.Y.2d 180, 187, 690 N.E.2d 1249, 1252-53, 668 N.Y.S.2d 143, 147 (1997). Additionally, if a court borrows the statute of limitations of another state, it should also borrow that state's rules as to accrual and tolling. See GML, Inc. v. Cinque & Cinque, P.C., 9 N.Y.3d 949, 950, 877 N.E.2d 649, 650, 846 N.Y.S.2d 599 (2007); Antone v. Gen. Motors Corp., 64 N.Y.2d 20, 31, 473 N.E.2d 742, 747, 484 N.Y.S.2d 514, 519 (1984).

Under the so-called borrowing statute, a court must determine where the cause of action accrued. According to the New York Court of Appeals, a cause of action accrues at "the time when, and the place where, the plaintiff first had the right to bring the cause of action." Global Fin. Corp. v. Triarc Corp., 93 N.Y.2d 525, 528, 715 N.E.2d 482, 484, 693 N.Y.S.2d 479, 481 (1999). As a general rule, when an injury is purely economic, the place of injury is where the plaintiff resides and sustains the economic impact of the loss. Id. at 529.

13

Two principal policies underlie the borrowing statute: first, the statute prevents non-residents from forum shopping in New York for a longer period of limitation; second, the statute is designed to promote certainty and uniform application of the law.  See Portfolio Recovery Assocs., LLC v. King, 14 N.Y.3d 410, 417-18, 927 N.E.2d 1059, 1062, 901 N.Y.S.2d 575 (2010); Global Fin. Corp., 93 N.Y.2d at 528-30, 715 N.E.2d at 484-86, 693 N.Y.S.2d at 480-82; ABB Power, 91 N.Y.2d at 186-87, 690 N.E.2d at 1252, 668 N.Y.S.2d at 146.

Here, we find that the injury is economic and therefore conclude that the cause of action accrued where plaintiffs reside.  See, e.g., Kat House Prods., LLC v. Paul, Hastings, Janofsky & Walker, LLP, 71 A.D.3d 580, 580-81, 897 N.Y.S.2d 90, 91 (1st Dep't 2010) (affirming application of California's statute of limitations to legal malpractice claim where plaintiffs were residents of, and thus sustained their loss in, California); Kidder, Peabody & Co. v. McArtor, 223 A.D.2d 502, 502-03, 637 N.Y.S.2d 99, 100 (1st Dep't 1996) (affirming application of Tennessee's statute of limitations to, inter alia, fraud and negligence claims where plaintiffs were residents of, and thus sustained their loss in, Tennessee); Basilotta v. Warshavsky, Nos. 115524/09, 115525/09, 2011 N.Y. Slip Op. 32185U, at *6-7, 2011 N.Y. Misc. LEXIS 3942, at *8-10 (Sup. Ct. N.Y. Cty. Aug. 8, 2011) (applying California statute

14

of limitations to legal malpractice claim where plaintiff was a resident of, and thus sustained its loss in, California); Pryor Cashman Sherman & Flynn, LLP v. Tractmanager, Inc., No. 0603515/2005, 2007 N.Y. Slip Op. 31332U, at *10-20, 2007 N.Y. Misc. LEXIS 9024, at *14-30 (Sup. Ct. N.Y. Cty. May 18, 2007) (applying Tennessee statute of limitations to, inter alia, unjust enrichment and legal malpractice claims where plaintiff was a resident of, and thus sustained its loss in, Tennessee).

It is undisputed that RA Global operates in Texas and that Burch is a Texas resident. Accordingly, Texas is the place of accrual.[8] In sum, if plaintiffs' claims are not timely under Texas law, they are time-barred even if New York would have a longer limitations period.[9]

---

[8] We reject plaintiffs' contention that another court reached a contrary conclusion. Specifically, plaintiffs argue that the United States District Court for the Northern District of Texas previously concluded that plaintiffs' injury did not accrue in Texas. That court reached no such conclusion. Rather, the Texas court held that it lacked personal jurisdiction over two individual defendants affiliated with GEM. (Gardner Decl. Ex. B.) It is well-settled that the accrual analysis under C.P.L.R. 202 is distinct from an analysis of personal jurisdiction. ABB Power, 91 N.Y.2d at 187-88, 690 N.E.2d at 1252-53, 668 N.Y.S.2d at 147 ("CPLR 202 requires that a court, when presented with a cause of action accruing outside New York, should apply the limitation period of the foreign jurisdiction if it bars the claim. . . . It matters not that jurisdiction is unobtainable over a defendant in the foreign jurisdiction or that the parties have contracted to be venued in [New York]."); see also Portfolio Recovery, 14 N.Y.3d at 417-18, 927 N.E.2d at 1062, 901 N.Y.S.2d 575. Thus, the Texas court's analysis is not persuasive in the instant context.

[9] We note that this conclusion is consistent with the policies that underlie the borrowing statute -- in particular, the desire to prevent forum shopping. Here, plaintiffs commenced a similar lawsuit in Texas in 2007, more than three years before the FAC was filed. In the Texas Action, plaintiffs alleged a similar scheme and asserted similar causes of action. Thus, given plaintiffs' original preference to litigate these issues in Texas, their state of residence and a state that has limitations periods that are often

## II.  Claims Asserted Against Nixon

As noted above, plaintiffs assert four causes of action against Nixon.  We address the timeliness of each claim in turn.

### A.  Fraudulent Inducement

Under Texas law, the statute of limitations for fraudulent inducement is four years.  Tex. Civ. Prac. & Rem. Code § 16.004(a)(4); see also Walker v. Presidium Inc., 296 S.W.3d 687, 694 (Tex. App. 2009).  The comparable statute of limitations under New York law is "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it."  N.Y. C.P.L.R. 213(8); see also Prichard v. 164 Ludlow Corp., 49 A.D.3d 408, 408-09, 854 N.Y.S.2d 53, 54 (1st Dep't 2008).  Because the Texas statute of limitations is shorter, the fraudulent inducement claim must be dismissed if it is untimely under Texas law.

Under Texas law, a cause of action accrues when a wrongful act causes a legal injury.  See SV. v. R.V., 933 S.W.2d 1, 4 (Tex. 1996); Walker, 296 S.W.3d at 694.  Whether a plaintiff has discovered the injury or whether all resulting damage has occurred is typically not relevant for accrual purposes.  See S.V., 933 S.W.2d at 4; Seaureau v. ExxonMobil Corp., 274 S.W.3d

---

shorter than those applicable under New York law, see infra, we think that the policy concerns are relevant in this action.

206, 226 (Tex. App. 2008).   Consequently, unless a deferred
accrual rule applies, a fraudulent inducement claim will accrue
no later than the date that the induced agreement was executed.
See Seaureau, 274 S.W.3d at 226-27.

    Here, plaintiffs contend that Nixon fraudulently induced
four agreements: the First Loan Agreement, the Second Loan
Agreement, the MOU, and the Escrow Deed.   Assuming plaintiffs
adequately allege that each of the above-mentioned agreements
were fraudulently induced, the claim concerning the First Loan
Agreement accrued no later than July 26, 2005, the claim
concerning the Second Loan Agreement accrued no later than June
28, 2006, the claim concerning the MOU accrued no later than
August 25, 2006, and the claim concerning the Escrow Deed
accrued no later than October 8, 2006.

    An exception to the general accrual rule exists "[i]n rare
cases where the nature of the injury is inherently
undiscoverable and evidence of the injury is objectively
verifiable."   Seaureau, 274 S.W.3d at 227 (citing Computer
Assocs. Int'l, Inc. v. Altai, Inc., 918 S.W.2d 453, 455 (Tex.
1996)); see also S.V., 933 S.W.2d at 6.   This deferred accrual
rule is referred to as the discovery rule and it operates to
defer the accrual of a cause of action until "a plaintiff
discovers or, through the exercise of reasonable care and
diligence, should discover the 'nature of his injury.'"   Childs

v. Haussecker, 974 S.W.2d 31, 40 (Tex. 1998) (citing Trinity River Auth. v. URS Consultants, Inc., 889 S.W.2d 259, 262 (Tex. 1994)).  Plaintiffs contend that the discovery rule should apply to its fraudulent inducement claim.

As the discovery rule has been interpreted by Texas courts, an injury is objectively verifiable if it may be proven by direct, physical evidence.  See S.V., 933 S.W.2d at 7 (collecting cases).  Among the injuries that the Texas Supreme Court has identified as objectively verifiable are a negligent vasectomy confirmed by a subsequent pregnancy, self-dealing confirmed by a paper trail, and misconstruction of a building confirmed by the nature of the building itself.  Id. (collecting cases).  Because the plaintiffs' injuries here cannot be proven by direct, physical evidence, we conclude that the discovery rule does not apply.

Next, plaintiffs contend that accrual should be deferred pursuant to the fraudulent concealment doctrine.  Unlike the discovery rule, there is an affirmative obligation on a plaintiff to prove fraudulent concealment.  See Trousdale v. Henry, 261 S.W.3d 221, 235 (Tex. App. 2008) (citing KPMG Peat Marwick v. Harrison Cty. Hous. Fin. Corp., 988 S.W.2d 746, 749 (Tex. 1999)); see also Seaureau, 274 S.W.3d at 228.

To prove fraudulent concealment, a plaintiff must establish that the defendant had: "(1) actual knowledge that a wrong

occurred; (2) a duty to disclose the wrong; and (3) a fixed purpose to conceal the wrong." Trousdale, 261 S.W.3d at 235. Even when these three elements are adequately pleaded, "the estoppel effect of fraudulent concealment ends when a party learns of facts, conditions, or circumstances which would cause a reasonably prudent person to make inquiry, which, if pursued, would lead to discovery of the concealed cause of action." Ponder v. Brice & Mankoff, 889 S.W.2d 637, 645 (Tex App. 1994); see also Seaureau, 274 S.W.3d at 228.

We conclude that deferred accrual under the fraudulent concealment doctrine is inapplicable here. Plaintiffs do not adequately allege that Nixon or Peterson had a fixed purpose to conceal any of the alleged wrongs. In fact, the documents incorporated into the complaint demonstrate that Nixon neither concealed the relationship among the defendants nor the nature of the so-called loan-to-own scheme. Specifically, the First Loan Agreement and Second Loan Agreement disclose that Nixon and Peterson acted as counsel to Avicenna, as lender. (Warder Decl. Exs. B, C.) Additionally, each of the transaction documents disclose the nature of the secured transaction, undermining plaintiffs' argument that the defendants concealed the fact that their lenders could or would foreclose on collateral in the event RA Global defaulted on its debt. (Warder Decl. Exs. B, C, D; Gardner Decl. Ex. A.) Thus, there is no plausible argument

that Nixon or Peterson had a fixed purpose to conceal the alleged wrongs.

Even assuming the fraudulent concealment doctrine were applicable, deferral stops when a party has actual notice or inquiry notice of the purportedly concealed cause of action. Here, plaintiffs were aware of Nixon's relationship to Avicenna as early as July 26, 2005, when that relationship was disclosed in the loan documents. That fact would cause a reasonably prudent person to inquire into the allegiance of its lawyers and would lead to the discovery of the cause of action.

Thus, because accrual of the alleged injury was not deferred pursuant to the discovery rule or the fraudulent concealment doctrine, the fraudulent inducement claims based on the First Loan Agreement, the Second Loan Agreement, and the MOU are time-barred because each was executed more than four years before plaintiffs filed their FAC.

Accordingly, the only remaining issue is whether plaintiffs assert a timely claim for fraudulent inducement of the Escrow Deed. Such a claim would have accrued no later than October 8, 2006, and therefore would be timely on its face. Plaintiffs maintain that the FAC includes such a claim. Nixon, on the other hand, construes the FAC differently. According to Nixon, plaintiffs allege that the two loan agreements and the MOU were fraudulently induced, and as a result of that fraudulent

20

inducement, the lenders were able to obtain control of RA Global's assets, including the IGOMS shares.   Thus, they conclude, there is no independent claim for fraudulent inducement of the Escrow Deed.

Plaintiffs point to four paragraphs of the FAC in support of their contention that the Escrow Deed was fraudulently induced by Nixon.   (FAC ¶ 37 ("Peterson and Nixon [] acted as counsel to both [RA Global] and the Avicenna Defendants with respect to this transaction.   Peterson made specific misrepresentations to board members of [RA Global] and to Burch that the deal was beneficial to [RA Global]."); id. ¶ 44 ("During the initial time period commencing with the negotiation of the July 26, 2005 loan and continuing up through and including the execution of the Escrow Deed in October 2006, Peterson and Nixon [] represented to Plaintiffs that they were acting as their attorneys with respect to the above described transactions.   Accordingly, Plaintiffs relied on the advice of Peterson and Nixon . . ."); id. ¶ 69 ("[RA Global] entered into a series of financial transactions including the Notes and the MOU (and Burch executed a personal guaranty) described above in reliance on the misrepresentations and omissions of the Avicenna Defendants, CapitalinQ, Peterson and Nixon [] (through the acts and omissions of Peterson and others), with regard to the intentions underlying the transactions, the purpose and

21

ramifications of the transactions and the relationships among the parties. . . . This fraudulent scheme . . . to cause the loss of IGOMS to the benefit of the Defendants, caused severe and extensive damage to Plaintiffs."); id. ¶ 70 ("This loan to own scheme included, inter alia, onerous and control altering loan provisions that were misrepresented and falsely explained by Peterson . . . All of this information was intentionally and knowingly withheld, misrepresented and omitted for the purpose of inducing Plaintiffs to enter into the transactions.").

Paragraphs 44, 69, and 70 do not contain plausible allegations that the Escrow Deed was fraudulently induced. Rather, they relate to the purported malpractice, the fraudulent inducement of unspecified "transactions," or the fraudulent inducement of the First Loan Agreement, the Second Loan Agreement, and the MOU. Paragraph 37 is the only paragraph that could be construed as alleging fraudulent inducement of the Escrow Deed by Peterson. However, the only sentence that could plausibly support a fraudulent inducement claim -- "Peterson made specific misrepresentations to board members of [RA Global] and to Burch that the deal was beneficial to [RA Global]" (FAC ¶ 37) -- makes no mention of Nixon.

Throughout the complaint, plaintiffs' theory of liability concerning Nixon turns on Nixon's responsibility for the actions of its former partner. Such a theory may suffice where Peterson

22

is alleged to be acting in a legal capacity.  Here, however, there is no explicit allegation that Peterson was acting in a legal capacity.   Moreover, we cannot reasonably draw that inference because Peterson was a member of RA Global's board at the time he allegedly made misrepresentations to it.   In fact, there is simply nothing in the complaint that constitutes a plausible allegation that Peterson was acting in a legal capacity, as opposed to as a director, when he made the alleged misrepresentations concerning the Escrow Deed.   We emphasize that on a motion to dismiss, the Court must only accept as true well-pleaded factual allegations, not an allegation such as this that is rife with legal conclusions.   Thus, we cannot conclude that this one statement -- at once ambiguous and conclusory -- is a plausible allegation that <u>Nixon</u> fraudulently induced the Escrow Deed.

Accordingly, we dismiss plaintiffs' fraudulent inducement claim as time-barred under Texas law.

**B.   Legal Malpractice**

The statute of limitations for legal malpractice under Texas law is two years.   Tex. Civ. Prac. & Rem. Code § 16.003(a); <u>see also</u> <u>Apex Towing Co. v. Tolin</u>, 41 S.W.3d 118, 120 (Tex. 2001).   Under New York law, the corresponding statute of limitations is three years.   N.Y. C.P.L.R. 214(6); <u>see also</u> <u>Zorn v. Gilbert</u>, 8 N.Y.3d 933, 934, 866 N.E.2d 1030, 1031, 834

N.Y.S.2d 702 (2007).  Texas law provides the shorter statute of limitations; thus, the malpractice claim must be timely under Texas law to survive this motion to dismiss.

As a threshold matter, plaintiffs asserted their malpractice claim against Nixon on September 21, 2010. Accordingly, the malpractice claim is time-barred unless accrual of the claim is deferred and/or the running of the statute of limitations is tolled until September 21, 2008.

Under Texas Law, the discovery rule applies to legal malpractice cases.  Willis v. Maverick, 760 S.W.2d 642, 646 (Tex. 1988).  In other words, the statute of limitations "does not begin to run until the client discovers or should have discovered through the exercise of reasonable care and diligence the facts establishing the elements of a cause of action." Apex, 41 S.W.3d at 120-21 (citing Willis, 760 S.W.2d at 646). In extending the discovery rule to malpractice cases, the Texas Supreme Court reasoned that such a rule is appropriate because it may be unrealistic for a lay client to be able to perceive an injurious act or omission of his attorney.  Willis, 760 S.W.2d at 645.

Plaintiffs contend that the discovery rule applies to their malpractice claim and renders that claim timely.  We disagree. As noted above, accrual of a cause of action is deferred under the discovery rule only until a client has actual notice or is

on inquiry notice of facts that establish the elements of a cause of action. Here, plaintiffs were on notice of the facts underlying their malpractice claim as early as July 26, 2005, when the transaction documents disclosed that Peterson and Nixon represented Avicenna, the lenders under the First Loan Agreement. Additionally, plaintiffs were on notice of the allegedly undisclosed conflict on June 28, 2006, when the transaction documents again disclosed that Peterson and Nixon represented Avicenna.

More importantly, plaintiffs had notice of the facts underlying the malpractice action in or about August 2007, when plaintiffs commenced the Texas Action against Avicenna and others, alleging that the First Loan Agreement, the Second Loan Agreement, and the MOU were fraudulently induced. Not only was Nixon's representation of plaintiffs related to the very agreements at issue in the Texas Action, but plaintiffs specifically alleged in the Texas Action that Peterson, the Nixon lawyer, was controlled by the other defendants. In other words, although neither Nixon nor Peterson were named as defendants in the Texas Action, plaintiffs made it abundantly clear that they considered Peterson to be a part of the alleged conspiracy to take over its business. In sum, it is clear that plaintiffs were on notice of the facts establishing its malpractice action no later than August 2007, more than two

years before the FAC was filed.  Thus, the discovery rule cannot render plaintiffs' claim timely.

Next, plaintiffs argue that the running of the statute of limitations is tolled and therefore the malpractice claim is timely.  Indeed, under Texas law, a tolling rule applies in certain legal malpractice cases.  In Hughes v. Mahaney & Higgins, the Texas Supreme Court held that "when an attorney commits malpractice in the prosecution or defense of a claim that results in litigation, the statute of limitations on the malpractice claim against the attorney is tolled until all appeals on the underlying claim are exhausted."  821 S.W.2d 154, 157 (Tex. 1991).  In Hughes and its progeny, the court identifies two principal policies that underlie the tolling rule.  First, the tolling rule allows the client to avoid being in "the untenable position of having to adopt inherently inconsistent litigation postures in the underlying case and the malpractice case."  Apex, 41 S.W.3d at 121 (citing Hughes, 821 S.W.2d at 156).  Second, the court reasoned that the tolling rule is justified because the viability of a malpractice action often depends on the outcome of the underlying litigation.  See Hughes, 821 S.W.2d at 157; see also Apex, 41 S.W.3d at 121.

After Hughes, the Texas Supreme Court stated that the tolling rule should be automatically applied in certain contexts.  Specifically, the court reasoned that: "without re-

examining whether the policy reasons behind the tolling rule apply in each legal-malpractice case matching the Hughes paradigm, courts should simply apply the Hughes tolling rule to the category of legal-malpractice cases encompassed within its definition." Apex, 41 S.W.3d at 122.

This language has caused some uncertainty among Texas jurists as to whether a bright-line tolling rule applies to cases involving alleged malpractice in a transactional setting. There are at least two reasons for this confusion. First, Hughes itself states that the rule announced applies "when an attorney commits malpractice in the prosecution or defense of a claim that results in litigation." S.W.2d at 157 (emphasis added). Second, in directing courts to apply the tolling role to cases "matching the Hughes paradigm," the Apex court cites cases where opposite results are reached. Compare Burnap v. Linnartz, 914 S.W.2d 142, 147 (Tex. App. 1995) (tolling doctrine does not apply to malpractice claim stemming from preparation and execution of corporate documents) with Utica Ins. Co. v. Pruitt & Cowden, 902 S.W.2d 143, 147-48 (Tex. App. 1995) (tolling doctrine does apply to malpractice claim stemming from the preparation of loan documents); see also Vacek Grp., Inc. v. Clark, 95 S.W.3d 439, 442-46 (Tex. App. 2002) (analyzing Apex).

After the court's ruling in Apex, Texas courts have periodically reviewed whether Apex and Hughes apply in

malpractice cases involving transactional work. Although there is some support for tolling in this context, the weight of authority supports the conclusion that the <u>Hughes</u> rule is inapplicable where a plaintiff alleges that an attorney committed malpractice during the course of transactional work. <u>See, e.g.</u>, <u>Pak v. Harris</u>, 313 S.W.3d 454, 459-60 (Tex. App. 2010) ("Because any alleged negligence arising out of [the attorney's] representation of [the clients] in the merger transaction at issue is not malpractice committed during the prosecution or defense of a claim that results in litigation, the <u>Hughes</u> rule does not apply . . ."); <u>Brennan v. Manning</u>, No. 07-06-0041-CV, 2007 WL 1098476, at *2 (Tex. App. Apr. 12, 2007) ("The existence of an attorney-client relationship does not, standing alone, toll limitations in a legal malpractice cause of action. . . . The <u>Hughes</u> rule, which tolls the limitations period until all appeals in the underlying action are exhausted, is expressly limited to cases involving claims of attorney malpractice in the prosecution or defense of the underlying litigation and does not apply to malpractice claims involving transactional work.");[10] <u>but see</u> <u>UNC, Inc. v. Hall</u>, No. 3:96-CV-

---

[10] Various other courts and secondary sources concur that the <u>Hughes</u> doctrine is inapplicable in the transactional context. <u>See, e.g.</u>, <u>McCranie v. Chamberlain, Hrdlicka, White, Williams & Martin, P.C.</u>, No. 14-04-00793-CV, 2006 WL 278276, at *5-6 (Tex. App. Feb. 7, 2006); <u>Murphy v. Mullin, Hoard & Brown, L.L.P</u>, 168 S.W.3d 288, 292-93 (Tex. App. 2005); <u>Vacek Grp.</u>, 95 S.W.3d at 443-46; <u>see generally</u> 7 Tex. Jur. Attorneys at Law § 338 (2011) ("This tolling doctrine is narrow, and is applicable only when a lawyer commits

2456-P, 1998 WL 118151, at *3-5 (N.D. Tex. Mar. 5, 1998) (applying tolling doctrine in malpractice case involving transactional work).

We agree with Nixon that the Hughes doctrine does not apply in the present context for three reasons.  First, this case involves allegations of malpractice stemming from transactions, not litigation.  Accordingly, consistent with the well-reasoned opinions cited above, we agree that the tolling rule simply does not apply in this context.  Second, the policies that justify the Hughes rule simply have no application in this context. Specifically, at no point in time would plaintiffs be forced to adopt contradictory positions.  Indeed, their position in all of the prior litigations -- that the transaction agreements were fraudulently induced and thus void -- is wholly consistent with their position in this action.  Moreover, the viability of this action in no way depends on plaintiffs' success in the prior litigations.  We cannot justify extending the Hughes rule to a new context, like this, where the policies that underlie Hughes do not support such an expansion.  Third, as plaintiffs' counsel conceded at oral argument, plaintiffs' position logically leads to the conclusion that a client who feels wronged (or whose business transaction did not go according to plan) may bring any

---

malpractice in litigation of a claim or defense.  Where an attorney's work is transactional in nature, and does not involve litigation, the rule does not apply.").

number  of  lawsuits  seeking  recovery  under  any  number  of
theories.   Those  lawsuits  could  toll  the  statute  of  limitations
for  an  indefinite  period  of  time,  enabling  a  plaintiff  to  bring
a  malpractice  action  only  after  it  has  exhausted  its  theories  of
liability  against  other  defendants  and  after  it  has  concluded
that  it  has  not  recovered  as  much  as  it  would  like.   The  Texas
Supreme  Court  has  endorsed  no  such  rule.

Accordingly,  we  dismiss  plaintiffs'  malpractice  claim  as
untimely  under  Texas  law.

### C.   Civil Conspiracy

Claims  for  civil  conspiracy  are  also  subject  to  a  two-year
statute  of  limitations  under  Texas  law.   Tex.  Civ.  Prac.  &  Rem.
Code  §  16.003(a);  see also  In re Estate of Herring,  970  S.W.2d
583,  586  (Tex  App.  1998).   Even  assuming  this  cause  of  action
for  civil  conspiracy  were  cognizable  under  New  York  law,  which
it  is  not,  Crigger v. Fahnestock & Co.,  443  F.3d  230,  237  (2d
Cir.  2006)  ("Under  New  York  law,  civil  conspiracy  to  commit
fraud,  standing  alone,  is  not  actionable  .  .  .  if  the  underlying
independent  tort  has  not  been  adequately  pleaded.");  Stokes v.
Lusker,  No.  10-2254-cv,  2011  WL  2117621,  at  *3  (2d  Cir.  May  27,
2011)  (unpublished  opinion)  ("[T]he  district  court  correctly
concluded  that  because  New  York  state  law  does  not  recognize  an
independent  tort  of  conspiracy,  and  because  no  underlying
primary  tort  supports  plaintiff's  claim,  the  claim  fails."),

there is authority for applying the statute of limitations associated with the underlying primary tort.  N.Y. C.P.L.R. 213; see also Linden v. Moskowitz, 294 A.D.2d 114, 115, 743 N.Y.S.2d 65, 66 (1st Dep't 2002) (applying six-year statute of limitations to a civil conspiracy claim that arose from the same facts as a fraud claim).  Thus, if the conspiracy claim is not timely under the shorter Texas statute of limitations, it must be dismissed as time-barred.

Under Texas law, the two-year statute of limitations applicable to conspiracy claims "begins to run at each invasion of a plaintiff's interest causing loss and damage."  Nelson v. Am. Nat'l Bank, 921 S.W.2d 411, 415-16 (Tex. App. 1996); see also Mayes v. Stewart, 11 S.W.3d 440, 453 (Tex. App. 2000). Here, the FAC includes no allegation that would render the conspiracy claim timely.  Each of the transactions that form the basis of the fraudulent inducement claim -- the First Loan Agreement, the Second Loan Agreement, and the MOU -- were executed prior to October 2006.  Thus, because these acts occurred more than two years before the FAC was filed, they cannot be the basis of a timely conspiracy claim.  Assuming the Escrow Deed were relevant to this claim, the deed was executed in October 2006 and the IGOMS shares were distributed to GEM following RA Global's alleged default in or around August 2007. Accordingly, the acts related to the Escrow Deed do not render

the conspiracy claim timely.  Finally, we can identify no other acts in the FAC that are within the two-year limitations period.[11]

Additionally, plaintiffs argue that the discovery rule applies and defers accrual of the conspiracy claim, rendering that claim timely.  Again, we disagree.  As noted above, when the discovery rule applies, it defers accrual of the cause of action only until the plaintiff knew or should have known of the facts giving rise to the claim.  See Estate of Herring, 970 S.W.2d at 587.  It is apparent that plaintiffs were on notice of the facts giving rise to the conspiracy claim as of August 2007 -- if not before -- when plaintiffs asserted a nearly-identical conspiracy claim against Avicenna, Gün, and others.  Thus, for the reasons more fully elaborated above, the accrual of this cause of action occurred no later than August 2007, which renders the conspiracy claim untimely.

Finally, plaintiffs specifically allege that Peterson left Nixon in or about August 2007 and joined the law firm of Edwards Angell Palmer and Dodge LLP.  (FAC ¶ 33.)  Thus, plaintiffs' claim is time barred for the alternative reason that Nixon could not have been a co-conspirator later than August 2007, again

---

[11] Plaintiffs contend that Avicenna's decision to commence the New York Action against plaintiffs in late 2008 is an act that is relevant for statute of limitations purposes.  We disagree.  The lawsuit was an action by Avicenna for breach of a contract, an act that we conclude is not a cognizable basis for asserting a conspiracy claim.  In addition, that action was dismissed and plaintiffs incurred no damage.

rendering the claim untimely.   Cf. United States v. United States Gypsum Co., 438 U.S. 422, 464-65 (1978) (potential liability of co-conspirator extends until withdrawal from or abandonment of the conspiracy).

Thus, we conclude that the conspiracy claim is likewise time-barred.

### D.   Unjust Enrichment

Lastly, under Texas law, claims for unjust enrichment are governed by a two-year statute of limitations.  Tex. Civ. Prac. & Rem. Code § 16.003(a); see also Elledge v. Friberg-Cooper Water Supply Corp., 240 S.W.3d 869, 869-70 (Tex. 2007).   The corresponding statute of limitations in New York is six years. N.Y. C.P.L.R. 213(1); Sirico v. F.G.G. Prods., Inc., 71 A.D.3d 429, 434, 896 N.Y.S.2d 61, 66 (1st Dep't 2010).   As with the other claims, to avoid dismissal, the unjust enrichment claim must be timely under Texas law.

Plaintiffs' unjust enrichment claim is based on the allegation that "Nixon Peabody benefitted from the collection of legal fees associated with the transaction and conduct described herein."  (FAC ¶ 85.)  Plaintiffs also allege that Nixon Peabody represented plaintiffs from July 2005 through October 2006 and allege that Nixon sent plaintiffs an invoice dated October 6, 2005.  (FAC ¶¶ 23, 44-45.)

Even assuming plaintiffs paid the above-mentioned invoice, a fact that is not alleged, plaintiffs' unjust enrichment claim is time-barred.  Plaintiffs fail to allege any facts that would enable us to conclude that the unjust enrichment cause of action accrued any later than October 5, 2006, clearly more than two years before the FAC was filed.[12]  Moreover, even if the discovery rule applied, plaintiffs were on notice of the facts giving rise to the unjust enrichment claim no later than August 2007, when plaintiffs commenced the Texas Action.

Thus, the unjust enrichment claim is similarly untimely.

## CONCLUSION

For the foregoing reasons, the motion (docket no. 26) is granted.  The remaining parties shall appear for a telephonic status conference on September 26, 2011 at 2:30 p.m. and shall be prepared to discuss a proposed course of action concerning the claims against defendant Peterson.

---

[12] When the Court asked plaintiffs' counsel whether he possessed any other invoices sent to his clients by Nixon, counsel responded that his "understanding" was that other invoices existed.  However, during the pendency of the motion, plaintiffs' counsel did not endeavor to supplement the record with additional invoices, nor did he endeavor to do so after being pressed at oral argument.  (Transcript of Oral Argument, dated August 10, 2011, at 11-14.)

Dated:     New York, New York
           September 7, 2011


                              NAOMI REICE BUCHWALD
                              UNITED STATES DISTRICT JUDGE


Copies of the foregoing Order have been mailed on this date to
the following:

**Attorney for Plaintiff**
Brian L. Gardner, Esq.
Sullivan Gardner, P.C.
475 Park Avenue South, 30th Floor
New York, NY 10016

**Attorneys for Defendant**
Frederick B. Warder, III, Esq.
Jason S. Zack, Esq.
Patterson, Belknap, Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036